IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LYKUONG ENG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| AKRA AGRICULTURE PARTNERS, INC., | § | 5:16-cv-00994 |
| SICHAN AUN SIV, RICHER SAN, | § | |
| SITHEA SAN, THOMAS A. WILLEMS, | § | |
| AND ESTATE OF WILLIAM R. NOJAY, | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendants. | § | |

## COMPLAINT

**COMES NOW** LYKUONG ENG (Eng), Plaintiff, complaining of AKARA AGRICULTURE PARTNERS, INC. (Akra), SICHAN AUN SIV (Siv), RICHER SAN (Richer San), SITHEA SAN (Sithea San), THOMAS A. WILLEMS (Willems), and the ESTATE OF WILLIAM R. NOJAY (Nojay), Defendants, showing as follows:

## PARTIES

1. Plaintiff Eng is a Cambodian citizen and a resident of Phnom Penh, Cambodia.

2. Akra is a corporation believed to be registered in both Cambodia and Delaware. It ostensibly does business in San Antonio, Texas. On information and belief, it can be served at either 119 Fox Hall Lane, San Antonio, Texas 78213, or 799 N. St. Mary's Street, Suite 1825, San Antonio, Texas 78205, pursuant to Rule 4, Federal Rules of Civil Procedure (FRCP).

3. Defendant Siv is believed to be a citizen of Cambodia. He is also an American citizen and maintains a residence in San Antonio, Texas. Defendant Siv formerly served as an Ambassador of the United States to the United Nations. On information and belief, he can be

served at Akra Agriculture Partners (Cambodia) Corporation, No. 41, St. 322, Sangkat Boeung Keng Kang1, Khan Chamcarmorn, Phnom Penh, Cambodia, pursuant to FRCP 4.

4. Defendant Richer San is believed to be a Cambodian citizen and resident of Phnom Penh, Cambodia. Defendant Richer San is also an American citizen and maintains a residence in Bellflower, California, where he spends part of his time. His address is currently unknown. Upon learning of such address, he can be served thereat pursuant to FRCP 4.

5. Defendant Sithea San is also believed to be a Cambodian citizen and resident of Phnom Penh, Cambodia. Defendant Sithea San is also an American citizen and maintains a residence in Bellflower, California, where she spends part of her time. Sithea San is Richer San's wife. Her address is currently unknown. Upon learning of such address, she can be served thereat pursuant to FRCP 4.

6. Defendant Willems is a United States citizen and believed to be a Texas citizen. On information and belief, he may be served at 799 N. St. Mary's Street, Suite 1825, San Antonio, Texas 78205, pursuant to FRCP 4.

7. Defendant Nojay was a New York State legislator representing a District near Rochester before he committed suicide in September, 2016. Because of his demise, Plaintiff sues Nojay's Estate. That address is currently unknown. Upon learning of such address, Nojay's Estate can be served thereat pursuant to FRCP 4.

## JURISDICTION AND VENUE

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises in part under the securities laws of the United States, 15 U.S.C. § 78j(b) and/or Rule 10(b)(5), and the Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the State law causes of action as so related that they form part of the same case or controversy.

9. Further or alternatively, this Court has diversity jurisdiction as to citizenship under 28 U.S.C. § 1332(a)(2), and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred here.

11. This Court has personal jurisdiction over all Defendants because they were all acting in conspiracy with respect to the statutory and tort causes of action involved and Defendants Willems and Siv are believed to be a Texas citizens with addresses in San Antonio. Further, the subject of the suit is primarily securities violations and breach of fiduciary duty by the Individual Defendants in conjunction with soliciting an investment of $1 million from Eng in Akra, which appears to have its principal place of business in the United States in San Antonio, Texas. The individuals, to the extent acting as promoters or officers and directors of Akra, should be deemed subject to jurisdiction in the State of Akra's ostensible principal place of business. Further, all of the individual Defendants appear to have personal connections with the United States, and in general no one State appears to have any closer connection to the dispute or the Defendants than does Texas. Therefore, the Court has specific jurisdiction over the Defendants. Holding Defendants to defend here would not offend notions of fair play or justice.

## BACKGROUND FACTS

12. Eng is a dentist in Phnom Penh, Cambodia. Eng is married to Lim Sroy, who is in the construction business in Cambodia. Eng has two college-aged children living in the United States.

13. In or around 2012, a Ms. Kolvady Men (Men), a Khmer-American citizen, introduced Eng to Richer San, a Cambodian American who had business interests in Cambodia

and in Long Beach, California. On or about August 24, 2012, Richer San solicited Eng to invest her money in Akra and suggested a meeting in the United States in mid-October 2012. On August 25, 2013, Richer San emailed to Eng a copy of Private Placement Memorandum (PPM) for a stock investment in Akra. The PPM was dated January 15, 2012. The address listed for Akra was 119 Fox Hall Lane, San Antonio, Texas 78213.

14. The PPM described Akra as a start-up company that would set up an agricultural cooperative and related businesses to help develop agriculture in Cambodia and support the export of agricultural products, primarily rice, from Cambodia to the United States. The PPM disclosed that the principals of Akra were Richer San, Siv, Nojay, and Willems. Eng became interested in investing.

15. On paper, the principals of Akra seemed to be an impressive group. The PPM represented that Siv would be the Chairman of Akra. Siv is a very prominent Cambodian America. Siv had survived imprisonment in Khmer Rouge labor camps as a young man and had escaped to Thailand. He came to the United States, attended Columbia University on a scholarship, became a United States diplomat, and was appointed as a U.S. Ambassador to the United Nations. Siv tells his own story in his best-selling book, *Golden Bones*. Eng was aware of Mr. Siv's background and had read *Golden Bones*. Willems was represented to be the President and Chief Executive Officer. The PPM described Willems in glowing terms as someone "instrumental in the rapid growth of such companies as PC's Ltd., later to become Dell Computers." Nojay, a New York State Assemblyman and former state official, was represented to be the Secretary Treasurer. Nojay was described as lawyer with extensive experience working with agribusiness companies on the development of bulk freight handling facilities. Richer San was represented to be the Vice-President of and Director of business development. The PPM mentions that Richer San was "a

founding member and former director of the Golden Coast Bank, the first Cambodian chartered bank in the United States."

16. The PPM does not mention some of the more problematic aspects of Richer San business career. The Golden Coast Bank opened for business in 2007. On January 27, 2009, it consented to the issuance by the FDIC and the California Department of Financial Institutions of an Order to Cease and Desist from committing unsafe and unsound banking practices and violations of law and/or regulations, set forth in the joint FDIC CDFI Report of Examination dated May 5, 2008. On February 12, 2010, the Golden Coast Bank agreed to the entry of a Consent Order issued by the FDIC regarding correction of unsafe and unsound banking practices and compliance with laws and regulations. The Golden Coast Bank closed not long afterward, though the precise date of closure is not known to Eng. None of the problems related to Richer San's involvement as a founder and director Golden Coast Bank were disclosed in the PPM, facts Eng would have wanted to know before investing $1 million.

17. On or about October 22, 2012, Eng came to the United States to visit. On or about October 25, 2012, Eng attended a dinner at the Parker's Lighthouse Restaurant in Long Beach, California with Men, Sithea San, and Richer San. Sophy Khut may also have been present. The purpose of the dinner meeting was to answer any questions Eng had about investing in Akra. Sichan Siv was promoted at the dinner as one of the founders of Akra. After the dinner meeting, Men, Sithea San, Richer San, and Eng went to Richer San's and Sithea San's home in Bellflower, California. Sithea Siv set up a conference call on SKYPE or Viber between Siv and Eng. The primary purpose of the conference call was to introduce Eng to Siv to get Eng more comfortable with the investment in Akra. A few days later, Eng traveled to San Antonio to meet Siv in person.

18. The PPM stated that Akra intended to raise $4 million to start up operations. It also

stated the following:

> Until subscriptions for a minimum of 1,5000,000 Shares (US$1,500,000) are received and accepted by the Company, all funds received from Participants will be deposited into an escrow account and will not be used for any purpose.[1] No interest shall be paid on such escrow funds. Once subscriptions for a minimum of 2,000,000 Shares have been received and accepted by the Company, escrowed funds will be released, will become assets of the Company, and will be deposited in one or more operating accounts for the Company.
>
> This offering will expire on April 30, 2013 ("Termination Date"). If fewer than 1,500,000 Shares have been subscribed by the Termination Date (or an extension thereof), all funds received for such subscriptions and held in escrow shall be promptly returned. The Offer will "Close" on a continuous basis until the Termination Date upon the receipt of valid subscription documents and payments.
>
> If the Company Closes on a least $1,500,000 in subscribed capital but less than the $4,000,000 sought by this Offering, the Directors will make decisions, in their authority, on the best deployment of available capital. This will mean that the Directions will use their best judgment and good faith to prioritize the Company's activities and sustain operations for as long as possible to the meet the Company's Mission.

19. Richer San, Siv, Willems, and Nojay orally represented to Eng that $3 million had already been raised, and that $1 million more was needed. That representation, made orally, was false. Upon information and belief, Eng was the only outside investor who put up money.

20. Based on the information in the PPM and the oral representations made by the Defendants, Eng agreed to invest the "final" $1 million needed.

21. Pursuant on instructions provided by Nojay and relayed by Richer San, Eng wire transferred the $1 million to an account at First Niagara Bank in Rochester, New York. The account was controlled by Nojay and styled "William Nojay Attorney Special Account IOLA." The money was sent in in three installments. The first installment of $500,000 was sent on

[1] The PPM failed to disclose that there were no internal controls. Nothing prevented Nojay, for example, from taking the money himself and nothing prevented Akra itself from breaching the escrow, which later occurred. A reasonable investor would have wanted to know that before sending $1million around the world.

November 1, 2012 while Eng was still in the United States. Eng returned shortly thereafter to Cambodia. She had several more meetings with Richer San, Willems, and Nojay in the restaurant of the Almond Hotel in Phnom Penh. The defendants made further representations about the soundness of Akra. On January 15, 2013 and March 1, 2013, Eng wire transferred two (2) more installments of $250,000 each to the same bank account in Rochester, New York controlled by Nojay.

22. Akra never began operations. However, after receiving Eng's money, Akra's principals began spending money on overhead. Willems and San leased a large office villa in Phnom Penh and started driving a new black Toyota Tundra and a new light colored, mid-size Lexus sports utility vehicle in Phnom Penh. The new office had attractive round tables, an overhead projector, and computers. Men visited the office villa at least once. She saw Willems, Richer San, and an office staff of local Cambodians. Upon information and belief, Richer San paid himself $6,000 to $9,000 per month. From October 2012 through September 2013, Akra spent at least $625,065.42 on overhead, including "labor" costs of $206,962.31, $119,747 on "General and Administrative Expenses," $47,400 on rent, and $24,650 on vehicles.

23. Several months after the initial investment, the first shareholder meeting occurred. Eng asked the progress of Akra. She was told that Richer San and Siv had resigned from the company, that Akra was still negotiating various agreement with third parties, but that it had not yet started operations. On or about January 19, 2014, Eng emailed Willems to express her concern and request an update. Willems responded by email on January 22, 2014:

> I am in Mexico City working on several projects. I will give you a full and detailed briefing when I get back. I will be traveling back to Phnom Penh arriving Saturday. I will be more than happy to discuss all of your concerns at this time. We have made significant progress of late, which I sure you will be quite pleased with. Sincerely, Tom.

Email correspondence and requests for information continued. On March 12, 2014, Eng again asked for a progress update. Willems again reassured Eng that all was well: "Yes, we have made significant progress of late. I will be traveling to both Mexico and America nest week to sign the joint venture agreement, as well as verify several orders."

24. Eng thereafter realized that, contrary to Willems' representations, nothing of consequence was happening. She further learned that, contrary to the Defendants' representations, Akra had not raised $3 million from other investors. Eng was the only outside investor. Akra and its principals and promoters took her $1 million and spent it on soliciting other investors (unsuccessfully), "overhead expenses," and themselves, contrary to their representations and contrary to the specific provisions of the PPM which required Akra to hold the money in escrow and refund it if Akra failed to raise at least $1,500,000 from outside investors. Eng demanded a refund of her money, which Akra has refused to provide.

25. In short, Eng was scammed by Defendants out of $1 million.

## CAUSES OF ACTION

### COUNT 1—TEXAS SECURITIES ACT VIOLATIONS

26. Eng hereby incorporates by reference the allegations in paragraphs 12-25 above.

27. Akra and the Individual Defendants made false representations or omissions to Eng in selling her securities in Akra, and therefore are liable for the $1 million in losses suffered by Eng under Tex. Rev. Civ. Stat. Art. 581-33 (TSA) § A(2).

28. Pleading in the alternative, one or more of the Individual Defendants are control persons of Akra, and therefore liable jointly and severally for the fraudulent sale of securities in Akra by any other of the Individual Defendants for the $1 million in losses suffered by Eng under TSA § F(1).

29. Pleading in the alternative, one or more of the Individual Defendants directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aided one or more of the other Individual Defendants in selling the securities of Akra to Eng, and are therefore liable jointly and severally for the $1 million in losses suffered by Eng under TSA § F(2).

30. Pleading as to the Statute of Limitations in TSA § H(2), Eng did not discover, nor should she have discovered in the exercise of due diligence, the untruths or omissions based upon which she sues under TSA §§ A(2), F(1), or F(2) more than three years ago. Further, she sues within five years of the untruths or omissions.

31. Eng sues for rescission. Alternatively, Eng therefore prays for damages in the amount of $1 million from the Individual Defendants, jointly and severally.

32. Eng has retained counsel to pursue these claims and agreed to pay them their reasonable attorneys' fees. Eng therefore prays for an award of her reasonable attorneys' fees under TSA § D(7).

33. Eng also prays for her costs under TSA § D(6).

**COUNT 2—FRAUD IN A STOCK TRANSACTION**

34. Eng hereby incorporates by reference the allegations in paragraphs 12-25 above.

35. One or more of the Individual Defendants made a false representation of a past or existing material fact—to wit, that $3 million had already been raised for Akra and that only another $1 million was needed—to Eng to induce her to enter into a contract to purchase stock in Akra. Eng relied on that false representation. Therefore, one or more of the Individual Defendants are liable to Eng for her $1 million loss under Tex. Bus. & Com. Code § 27.01(a)(1).

36. Pleading further or in the alternative, one or more of the Individual Defendants

made a false promise to do an act—to wit, to return her $1 million investment if $1.5 million was not raised, or alternatively to pay dividends for profits obtained by Akra—to Eng to induce her to enter into a contract to purchase stock in Akra. This false promise was material, made with the intention of not fulfilling it, and made to Eng for the purpose of persuading her to buy stock in Akra. Eng relied on that false representation by contracting to buy the stock in Akra. Therefore, one or more of the Individual Defendants are liable to Eng for her $1 million loss under Tex. Bus. & Com. Code § 27.01(a)(2).

37. Pleading further or in the alternative, one or more of the Individual Defendants had actual awareness of the falsity of such representation or promise made by such Individual Defendant, and is liable to Eng for exemplary damages under Tex. Bus. & Com. Code § 27.01(b).

38. Pleading further or in the alternative, one or more of the Individual Defendants had actual awareness of the falsity of the representation or the promise made by one or more of the other Individual Defendants to Eng, failed to disclose this falsity to Eng, and benefitted from the false representation or promise—to wit, by obtaining some portion of the $1 million dollars invested by Eng—and therefore is liable to Eng for exemplary damages under Tex. Bus. & Com. Code § 27.01(d).

39. Eng has retained counsel to pursue these claims and agreed to pay them their reasonable attorneys' fees. Under Tex. Bus. & Com. Code § 27.01(e), one or more of the Individual Defendants is liable to Eng for her reasonable and necessary attorneys' fees for trial and all appeals, expert witness fees, costs for copies of depositions, and costs of court.

## COUNT 3—COMMON LAW FRAUD

40. Eng hereby incorporates by reference the allegations in paragraphs 12-25 above.

41. One or more of the Individual Defendants made material misrepresentations to Eng.

Particularly, but without limitation, in or around October, 2012, at least Defendants Richer San and Siv, on behalf of themselves and/or Willems and/or Nojay, represented to Eng that she needed to invest $1 million into Akra for promised remuneration to follow from her investment. They also made a material misrepresentation, or false promise without intent to perform, that her $1 million would be kept in escrow until $1.5 million was raised, yet instead the money was not kept in escrow and was not returned when the balance of the $1.5 million was not raised.

42. These misrepresentations and/or false promises were material.

43. The Individual Defendants knew these representations or promises were false, and that instead the $1 million would go to one or more of the Individual Defendants' own pockets.

44. Eng reasonably relied on these false representations by purchasing worthless stock and transferring $1 million to an account, controlled by Nojay, at First Niagara Bank, in Rochester, New York.

45. Eng has been damaged as a result of the misrepresentations and/or false promises through the loss of her $1 million "investment" in Akra.

46. Because these misrepresentations and/or false promises were fraudulent, Eng is entitled to recover exemplary damages against each Individual Defendant severally under Chapter 41, Tex. Civ. Prac. & Rem. Code, which she seeks in the highest amount so allowed or such other amount as the jury may award consistent with those provisions.

**COUNT 4—VIOLATIONS OF FEDERAL SECURITIES LAWS**

47. Eng hereby incorporates by reference the allegations in paragraphs 12-25 above.

48. On information and belief, and as stated in the PPM, Akra is a Delaware corporation with its principal place of business in the United States in San Antonio, Texas.

49. The solicitation of Eng to invest in Akra made by one or more of the Individual

Defendants was made in "interstate commerce," being between one or more citizens or residents of the United States and Eng as a foreign national, and was made, on information and belief, in part through a PPM which was prepared in the United States.

50. One or more of the Individual Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and/or Rule 10(b)(5) by (a) employing an artifice or scheme to defraud, (b) making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made not misleading; and/or (c) engaging in an act which operated as a fraud or deceit upon Eng in connection with the purchase or sale of a security.

51. In particular, Individual Defendants the Sans and Siv in or around October, 2012, misrepresented to Eng that $3 million dollars had been invested in Akra, when this was not true, and further represented that another $1 million dollar investment from Eng would allow for a sufficient investment for Akra to meet the minimum investment, when this was not true, in connection with the sale of security in Akra to Eng. The PPM touted the business experience of Richer San as a founder and director of Golden Coast Bank without mentioning that the bank had been the subject of a Cease and Desist Order regarding unsafe and unsound banking practices in January 2009, a Consent Order regarding unsafe and unsound banking practices and violations of laws and/or regulations, in February 2010, and shortly thereafter had closed due to financial distress. The PPM failed to disclose that there were no internal controls and nothing to prevent Akra or Nojay from invading the escrow account and spending Eng's money when the terms for release of that money had not been met. A reasonable investor would have wanted to know all of those things before sending $1 million to the other side of the world.

52. Further, pleading on information and belief, the Sans and Siv were acting in concert with and at the behest of Defendants Nojay and Willems and for their joint benefit, as evidenced

by the fact that Eng was told to wire the $1 million in funds to a Rochester, New York bank account which was, on information and belief, under the control of Nojay.

53. Eng has been damaged by the violations of Section 10(b) of the Securities Exchange Act and/or Rule 10(b)(5) by the loss of her $1 million "investment" in Akra, which monies instead went to, on information and belief, one or more of the Individual Defendants. The Individual Defendants should be jointly and severally liable for the violations, or alternatively each Individual Defendants should be liable to the extent to which he received various portions of the $1 million. After Eng invested, Akra and its principals, including and particularly Willems, continued to make unreasonably optimistic and untruthful statements about the business prospects of Akra to induce Eng to invest more money or prevent her from finding out that she had been scammed.

**COUNT 5—CONSPIRACY**

54. Eng hereby incorporates by reference the allegations in paragraphs 12-53 above.

55. The Individual Defendants had a meeting of the minds to take a joint course of action which was tortious or illegal, with one or more specific acts being taken in accordance with or pursuant to that common scheme; specifically, to scam Eng out of $1 million dollars.

56. Individual Defendants should therefore be jointly and severally liable to Eng for the $1 million from which she was scammed.

57. Further, because Individual Defendants acted fraudulently or maliciously as set forth in Chapter 41, Tex. Civ. Prac. & Rem. Code, they should be held severally liable for exemplary damages, which Eng seeks in the highest amount so allowed or such other amount as the jury may award consistent with those provisions.

**COUNT 6—BREACH OF CONTRACT AND ALTER EGO**

58. Eng hereby incorporates by reference the allegations in paragraphs 12-25 above.

59. Pleading in the alternative, to whatever extent Akra did make any monies from the $1 million Eng tendered into the Rochester bank account, Akra is liable for that sum and/or any income or profits obtained consequent thereto in accordance with the terms of the PPM.

60. Pleading in the alternative, Eng has fully performed under the contract with Akra and has fully complied with all conditions precedent. Under the terms of the PPM, since Akra did not raise at least $1,500,000 from investors, Akra is required to refund Eng's money to her. Eng has demanded a refund and has not received it. The failure to refund the $1 million is a breach of the Subscription Agreement between Akra and Eng.

61. Pleading further or in the alternative, the Court should pierce the corporate veil of Akra and hold one or more of the Individual Defendants responsible or liable for the contractual obligations of Akra to Eng, in that the corporate fiction was fraudulently used as the alter ego of one or more of the Individual Defendants and/or was a sham used to perpetrate a fraud on Eng.

62. Eng has hired counsel to pursue this claim on her behalf. Pursuant to Chapter 38, Tex. Civ. Prac. & Rem. Code, Eng should be awarded her reasonable and necessary attorneys' fees for trial and all appeals as relates to this breach of contract claim.

## COUNT 7—BREACH OF FIDUCIARY DUTY AND CONSPIRACY (SHAREHOLDER DERIVATIVE CLAIM)

63. Eng hereby incorporates by reference the allegations in paragraphs 12-25 above.

64. Pleading in the alternative, to whatever extent the $1 million dollars solicited from Eng was actually "invested" by the Individual Defendants in Akra, then these Individual Defendants were, on information and belief, all the officers and/or directors of Akra.

65. As such, the Individual Defendants owed fiduciary duties to the corporation, Akra, under Delaware law (as Akra is a Delaware corporation).

66. On information and belief, Eng is at least the majority shareholder of Akra. Also, Eng's interests are consistent with those of any other shareholders of Akra, if any, and with Akra's interests as a corporate entity.

67. Making demand on the officers and directors of Akra to bring this suit against the Individual Defendants would be futile, as, on information and belief, Individual Defendants constitute all the officers and directors of Akra and their self-interests are antagonistic to those of Akra and its shareholders.

68. Therefore, the Court should allow Eng to pursue this cause of action as a shareholder derivative claim against the Individual Defendants.

69. Individual Defendants have violated their fiduciary duty of loyalty to Akra.

70. Individual Defendants have committed waste of Akra's assets.

71. Individual Defendants have completely mismanaged Akra in such a gross fashion as to not be protected under the business judgment rule.

72. Individual Defendants have failed to institute or follow appropriate internal controls over the actions of the officers and directors.

73. Individual Defendants have stolen funds from Akra.

74. Individual Defendants have engaged in self-dealing.

75. As a result of the forgoing misconduct and breaches of fiduciary duty, Individual Defendants are liable to Akra for all damages suffered by Akra, which amount is not less than the $1 million invested by Eng, which has been totally dissipated, lost, squandered, stolen, misappropriated, or mishandled.

76. Individual Defendants should be ordered to disgorge all funds which they have received or been paid or divested from Akra.

77. In equity and justice, because Eng is the majority, if not only, shareholder of Akra, and in that a refund or payment of damages to Akra would remain subject to Individual Defendants as officers and directors, who have been shown to be totally disloyal and incompetent to handle any assets or business of Akra, payment of the disgorgement, refund, or damages by Individual Defendants should be paid directly to Eng, unless any other shareholders are determined to exist, in which event the funds should be distributed pro rata to the shareholders.

78. On information and belief, Individual Defendants have had a meeting of the minds or conspiracy with respect to one or more acts in defalcation of fiduciary duties and have committed one or more defalcation actions pursuant thereto. Therefore, all Individual Defendants should be jointly and severally liable for any damages assessed or other relief awarded.

79. Because the defalcation of the Individual Defendants is fraudulent or malicious, exemplary damages should be awarded against the Individual Defendants severally under Chapter 41, Tex. Civ. Prac. & Rem. Code, or alternatively under any applicable Delaware law, in the highest amount allowed by law, or such other amount as the jury may award.

80. Further and/or in the alternative, to the extent that a pool of assets or fund awardable to Akra is generated by this shareholder derivative claim, Eng seeks an award of attorneys' fees incurred in pursuit of this derivative claim charged against such pool or fund.

**COUNT 8—FIDUCIARY FRAUD**

81. Eng hereby incorporates by reference the allegations in paragraphs 12-25 above.

82. The PPM represents that Akra would hold investor funds in an escrow account and not spend that money until it raised $1,500,000 from outside investor. In reliance on that representation, Eng sent $1,000,000 to the "escrow account." By creating an escrow account and accepting Eng's money, Akra and its principals became fiduciaries for Eng. Akra, Nojay, and the

other Individual Defendants breached those fiduciary duties by invading the escrow account and spending Eng's money when the terms for release for the escrow to Akra's operating account had not been met. In short, Akra and its principals defrauded Eng while serving in a fiduciary capacity. They are jointly and severally liable to her in the amount of at $1 million.

83. Because of the fraud by Individual Defendants, exemplary damages should be awarded against the Individual Defendants severally under Chapter 41, Tex. Civ. Prac. & Rem. Code, or alternatively under any applicable Delaware law, in the highest amount allowed by law, or such other amount as the jury may award.

## CONDITIONS PRECEDENT

84. All conditions precedent to each and every cause of action set forth above have occurred, been met, been waived, or otherwise been satisfied.

## DEMAND FOR JURY TRIAL

85. Eng demands a jury on all issues so triable.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiff, Lykuong Eng, asks for the following relief:

1. Rescission of the stock purchase and restitution of $1 million.
2. Actual damages.
3. Exemplary damages.
4. Reasonable attorneys' fees.
5. Expert witness fees.
6. Costs of copies of depositions.
7. Costs of court.
8. Prejudgment and post-judgment interest on all claims so recoverable at the highest

legal rate allowed.

9. Disgorgement of Individual Defendants' funds to Akra or to Eng.

10. Such other or further relief to which Eng may be entitled.

Respectfully submitted,

/s/Mack Ed Swindle
Mack Ed Swindle
State Bar No. 19587500
mswindle@whitakerchalk.com
Lead Counsel in Charge

Thomas F. Harkins, Jr.
State Bar No. 09000990
tharkins@whitakerchalk.com

Robert Simon
State Bar No. 18390000
rsimon@whitakerchalk.com

**WHITAKER CHALK SWINDLE & SCHWARTZ PLLC**

301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Phone: (817) 878-0500
FAX: (817) 878-0501

**ATTORNEYS FOR PLAINTIFF LYKUONG ENG**